UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 22-10270-RGS

UNITED STATES OF AMERICA

v.

MICHAEL GIAMPAPA

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

June 25, 2024

STEARNS, D.J.

Defendant Michael Giampapa, who is charged with being a felon in possession of a firearm, seeks to suppress a loaded .380 caliber handgun found in an open Kix cereal box in the unfinished basement of his parents' home at 55 Lakefield Road in South Yarmouth, Massachusetts. Michael Giampapa was living temporarily in the home with his girlfriend and his three-year-old son. The court convened an evidentiary hearing on January 25, 2024 (Tr.1), and at counsel's request, the court continued the hearing to April 3, 2024, to hear additional witnesses. (Tr.2).

Based on the credible testimony and the exhibits offered into evidence at the hearings, I find the following material facts.

1. On the afternoon of May 16, 2022, Yarmouth police received a

report of a domestic disturbance at 55 Lakefield Road in South Yarmouth, described as a single-family residence with an attached garage. Officer Gordon Gibbons responded initially to the call. While en route, Officer Gibbons was advised that the disturbance involved defendant Michael Giampapa (hereafter Michael). Michael was known to Officer Gibbons and other Yarmouth officers as a long-time Cape Cod resident with a criminal record. On arriving at Lakefield Road, Officer Gibbons encountered Michael's mother, Suzie Viera, standing in the front yard of the home speaking to Michael on her cell phone. As Officer Gibbons approached, he observed Viera to be visibly upset, attempting to reassure her son that it was not she who had called the police. When Officer Gibbons asked Viera where Michael was, she replied "down in the basement." Tr. 1 at 10. She then added, "he has a gun," Tr.1 at 11-12, and that "he is not gonna come out for you guys." Tr.1 at 11. She further stated that Michael was "gonna shoot it out with us, because he is not gonna go back to prison." Tr.1 at 15. At Officer Gibbons' request, Suzie called Michael back. When Officer Gibbons asked Michael over the telephone to come out of the basement, he refused to do so in vulgar terms.

2. Officer Gibbons requested backup from his station and reported the situation as escalating. As he did so, Michael's stepfather, Andrew Viera,

who worked as a long-haul driver, arrived in his truck, and walked over to where Officer Gibbons and Suzie were standing. Suzie Viera told her husband that Michael was in the basement insisting that he had a gun.

3. Within several minutes, an additional half-dozen law enforcement personnel arrived at the scene, including Sergeant Neal Donahue, the shift supervisor, and a trained crisis negotiator. While Sergeant Donahue established a perimeter, Suzie told Officer Gibbons that Michael was living in the basement of the home and that an argument she had with him earlier precipitated the call to police. She also related that Michael's three-year-old son of whom she was the guardian was also inside the home. She stated that the argument with Michael had stemmed from a video she had sent to child welfare authorities showing Michael and his girlfriend using heroin.[1] When she went to the basement to confront Michael about the video, he became extremely angry. When she tried to leave, he pursued her upstairs. She ran outside the house and locked herself in her car. Michael followed here and pounded on the car windows, retreating to the house only when she threatened to call the police.

---

[1] The video had apparently been taken by Cassie Mendoza, the biological mother of Michael's son, and not, as Gibbons initially testified, by Suzie Viera.

4. After reporting the additional details to Sergeant Donahue, Officer Gibbons asked Suzie whether she believed Michael when he said that he had a gun. She replied yes, "he probably does have one," Tr.1 at 26, although she added that she had not seen Michael with any guns, Tr.1 at 27. She also said that Michael "sounded high." Tr.1 at 27. Sergeant Donahue then requested the dispatch of a SWAT team and a tactical Bearcat vehicle to the scene. He also ordered the surrounding roads closed to civilian traffic.

5. Shortly after the reinforcements arrived, Michael appeared at the doorway to the home screaming obscenities at his mother, stepfather, and the police. When police asked him to come outside, he refused. Michael's current girlfriend, Tiarah Geggatt, then emerged, but refused to answer police questions, stating that "she wasn't a snitch." Tr.1 at 30. While police were attempting to interview Ms. Geggatt, Michael darted out of the home armed with a knife and attempted to drive away in his mother's car. After his escape was thwarted by SWAT officers who used the Bearcat to pin the vehicle to the house, Michael left the car and fled back into the house under a fusillade of crowd control beanbags.

6. Officer Gibbons briefed Detective Michael Zontini, the head of the department's special victim's unit who had been summoned to the scene, on what had transpired prior to his arrival. Shortly after Officer Gibbons left to

return to the station, Michael emerged from the rear door of the home, surrendered to the officers, and was taken to a lockup.[2]

7. Detective Zontini introduced himself to Suzie and Andrew Viera, who had taken refuge in Suzie's vehicle along with Michael's three-year-old son. Detective Zontini observed Andrew to be in an agitated state. Without any prompting, Suzie asked Detective Zontini to have any gun that might be present removed from her house. Tr.1 at 63-64. She specifically expressed concern that her grandson might find the weapon and harm himself. Andrew, who had initially remained in the car, joined the conversation, expressing agreement with his wife's desire to have any gun taken out of the house for the child's safety, although he, like his wife, had not seen Michael with a gun.[3] Tr.1 at 64.

8. Detective Zontini explained that the Vieras would be required to sign a written consent giving permission for police to enter the house to

[2] On learning that Michael had given himself up, Officer Gibbons suspended an effort undertaken at Detective Kent's request to obtain a warrant for Michael's arrest from the Barnstable District Court. There was no discussion between the officers of any need for a search warrant. Tr.1 at 54, 123, 132.

[3] Detective Zontini relayed to Detective Kent the fact that neither of the Vieras, despite their suspicions, had actually seen a gun in Michael's possession or in the house. Tr.1 at 97.

search for a gun. Andrew then asked if Detective Chris Kent (with whom Andrew and Suzie had grown up in the Yarmouth area) was at work that day, and if he would come to the scene to explain things further. Detective Zontini called Detective Kent and gave the phone to the Vieras. The Vieras then walked over to the area just outside the garage waiting for Detective Kent to arrive.

9. Detective Kent, now retired but at the time a thirty-four-year Yarmouth police veteran, Tr.1 at 91, spoke over Detective Zontini's phone to the Vieras before leaving the station. Suzie explained to Detective Kent her fear that Michael had a gun in the home and that she wanted the house searched to recover any weapon before their grandson, who had "the run of the house," might find it. Tr.1 at 95.[4] Detective Kent explained to her that she and Andrew, as the primary owners of the home, could consent to its

[4] Andrew confirmed in his testimony that his grandson had free access to the basement where Michael had stored his things, as did Michael's sister Taylor and her three children who were also living temporarily at the house. Tr.2 at 26, 48-49. Andrew implied that he was not permitted to enter the basement because Michael had insisted on maintaining his privacy. Tr.2 at 27. I do not believe this testimony as Andrew admitted that he had the keys to the house in the event any repairs were needed, and that other family members (including children) had unrestricted access to the basement. Tr.1 at 119. I also find it incredible that a homeowner in the process of renovating his entire house would restrict his ability to oversee the interior construction work being done.

search. During this exchange, Suzie told Detective Kent that Michael, who had just been released from prison, was temporarily staying with his girlfriend in the basement of the house next to the family laundry room. Tr.1 at 108-109, 157. Detective Kent then spoke briefly to Andrew who echoed Suzie's concern about the gun; he also apologized for the fact that, because the house was being renovated, the officers would find it in "a mess at the time." Tr.1 at 96. Detective Kent explained separately to Suzie and Andrew the process by which they could authorize police to conduct a search of the house. When the Vieras expressed a desire to go forward with the search, Detective Kent told them that he would bring the proper paperwork to their house.

10. When Detective Kent arrived at the home, Andrew and Suzie met him at the east side entrance to the house adjacent to the garage where the auxiliary apartment was located. The Vieras invited Detective Kent and a fellow detective, Jeff Rivett, into the in-law space where they explained they were living while the main house was being gutted and remodeled. Detective Kent explained the consent process again and informed the Vieras of their right to refuse consent if they had changed their minds.[5] Neither hesitated,

[5] Andrew testified that Detective Kent had threatened "to toss my house upside down" if he refused to consent to the search, but that if he did

and Detective Kent proceeded to fill out the consent authorization form. He described the house as "a single-family ranch-style residence . . . [with] an attached garage." Tr.1 at 104. Detective Kent then read the consent form to the Vieras, both of whom signed it without expressing any reservations. Tr.1 at 100, 105.[6] To Detective Kent's eyes, both Vieras appeared "calm and

---

sign the consent form, "they would be gentle in my house, not tear it all apart, or if I didn't consent obviously they'd wait for a warrant." Tr.2 at 10. He also testified that he and his wife were "under duress" when they consented to the search and that neither of them had affirmatively asked the police to search the house for a gun. Tr.2 at 10-11, 38. Although Andrew's testimony in this regard is eerily reminiscent of cases like *Bumper v. North Carolina*, 391 U.S. 543 (1968), and *United States v. Vasquez*, 724 F.3d 15 (1st Cir. 2013), where consents to searches were found involuntary after police misrepresented their ability to obtain a warrant or to act without one if consent was not given, I do not find his testimony credible. An officer as experienced as Detective Kent would have known that he did not have probable cause to obtain a search warrant. First, there is nothing inherently illegal about the mere presence of a gun in a person's home. Second, while it would have been illegal for Michael as a convicted felon to possess a firearm, the only evidence that he did was his mother's belief that his threat to shoot it out with police was credible. She admitted, however, that she had never seen Michael with a gun in the house (Andrew testified to the same), and although Michael had emerged from the house, in an attempt to escape from police, he never brandished a firearm (only a knife) or threatened to open fire on police. It is telling that neither Detective Kent nor the also experienced Officer Gibbons undertook to obtain a search warrant, only a warrant for the then-barricaded Michael's arrest.

[6] The form clearly informs the signatory that he or she has the right to refuse consent. At the hearing, Andrew questioned whether the signature on the form was in fact his. Tr.2 at 42-43. He also testified flatly that Suzie Viera had never asked police to search her home for Michael's gun. I do not believe that testimony considering the many statements to the contrary Suzie

sober." Tr.1 at 108. At no point over the course of the afternoon, did either of the Vieras indicate that Michael had any ownership interest in the home or legal status as a tenant.[7] Nor did they limit the search to any specific area of the home.[8]

11. After the consent form was signed, Detective Kent, accompanied by Detective Rivett, proceeded to the basement where the Vieras indicated Michael was staying. Tr.1 at 111. The basement was located directly below the first floor of the main house (which, as Andrew had warned, was in a state of preconstruction demolition). Detectives Kent and Rivett accessed the

---

made to the responding officers. She was scheduled to testify following Andrew at the second evidentiary hearing but at the last minute did not appear.

[7] Andrew testified that he and Suzie had jointly purchased the property in 2001. He initially described the home as "a single-family residence with an accessory apartment." Tr.2 at 3. He later described the house as divided into a "Unit 1" and a "Unit 2," a description that he had never used in talking with police, and wording that he admitted was derived from a trial affidavit written by his lawyers. Tr.2 at 19-20, 47-48. When asked if Michael paid rent, Andrew stated that he "pitched in" by help[ng] with the utilities and he threw [in] what he could." Tr.2 at 8. No documentary evidence was presented corroborating any obligation that Michael might have had to pay rent. At best, he might have been legally deemed a tenant by sufferance.

[8] Cassie Mendoza was present when the Vieras signed the consent form. Detective Rivett was also present and witnessed the Vieras' signatures on the form. Neither side, however, called Mendoza as a witness. Detective Rivett corroborated Detective Kent's testimony in all relevant aspects.

basement and the laundry room by a stairway entered through the kitchen of the main house. The officers found the basement walls stripped bare, exposing the wiring and wall studs. In the area next to the laundry room, the officers observed a mattress spread out on the floor, scattered clothing, and portable shelves filled with boxes of food. There were no working doors or partitions isolating any part of the basement or obstructing access, including the space where the mattress and shelves were located. Nor was any area of the basement under lock and key.[9] Tr.1 at 120.

12. In a partially empty box of Kix cereal, Detective Rivett found a loaded Smith & Wesson M&P Bodyguard .380 caliber handgun. When Detective Kent reported to the Vieras that the gun had been found, they expressed relief. Tr.1 at 118.[10]

## RULINGS OF LAW

---

[9] A loose sheet was hanging from the frame of an empty doorway, but it did not obstruct access to the sleeping area of the basement. Tr.1 at 136-137. Andrew testified that once the sheetrock in the basement had been taken down "you could see into each room," Tr.2 at 8, consistent with the officers' observations when they initiated the search. I do not credit Andrew's speculation that Michael had hung blankets to partition off the sleeping area. Tr.2 at 9. The officers observed none nor do the contemporary photos of the scene of the search depict any.

[10] Andrew agreed that he "obviously" thanked the police for removing the gun from the house. Tr.2 at 44.

1. A search may be conducted without a warrant with the free and voluntary consent of a person possessing the ability and authority (actual or apparent) to give it. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether consent is voluntary is determined by a "totality of all the circumstances" test for which the government bears the burden of proof. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). Proof is by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see also Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984). Consent may be voluntary for Fourth Amendment purposes even though "unknowing," that is, given without the benefit of a *Miranda*-like warning. *Schneckloth,* 412 U.S. at 231-234. No "presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning." *United States v. Drayton*, 536 U.S. 194, 207 (2002). Police therefore have no duty to inform a person of the right to refuse consent when seeking permission to conduct a warrantless search. *See Schneckloth*, 412 U.S. at 227. Nor are police required to explain their purpose in asking for consent. *See Commonwealth v. Sanna,* 424 Mass. 92, 98. (1997). Police may also ask for consent to a search without any level of suspicion or prior

probable cause. *See Florida v. Royer*, 460 U.S. 491, 497-498 (1983) (plurality opinion); *Florida v. Bostick*, 501 U.S. 429, 434-435 (1991).

2. The fact that a person was advised of the right to refuse consent is strong evidence that her consent was voluntary. *Mendenhall,* 446 U.S. at 558-559 (defendant "had twice unequivocally indicated [his] consent to the search"). Advice of the right to refuse consent may also serve to dissipate the effects of an otherwise coercive atmosphere. *Cf. United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973).

3. Consent freely given means consent unfettered by coercion, express or implied; mere acquiescence to a claim of authority is not sufficient. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979).

4. That consent was voluntary can be inferred from the cooperative attitude of the person giving permission for a search. *See United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) (consenter assisted with the search); *see also United States v. Todisco*, 667 F.2d 255, 260 (2d Cir. 1981) (defendant's wife assisted with the search); *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994) (defendant freely surrendered the keys to his car door and trunk); *United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976) (defendant stepped back from the open door to make way after police requested entry); *State v. Brady*, 585 So.2d 524, 529 (La. 1991) (defendant

welcomed officers into the apartment she shared with the victim and offered no objection as they undertook a search).

5. A warrantless search may be conducted with the consent of a person with common authority over the premises or property. *See Matlock*, 415 U.S. at 171.

> The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id*. at 171 n.7. In the view of most courts, the actual authority to consent, as defined in *Matlock*, depends on more than a mere right of access, but also requires some right of mutual use. *See, e.g.*, *State v. Licari*, 659 N.W.2d 243, 252-253 (Minn. 2003).

6. A cotenant may consent to the search of an apartment shared with another tenant. *See Commonwealth v. Appleby*, 358 Mass. 407, 411 (1970). Family members may consent to the search of the home in which they reside. *See Commonwealth v. Yusuf*, 488 Mass. 379, 387 (2021). A sister may consent to the search of a closet in a room where her brother stayed as a guest. *Commonwealth v. Mendes*, 361 Mass. 507, 512-513 (1972),

*overruled on other grounds by Commonwealth v. Lopes*, 362 Mass. 448 (1972). A spouse may consent to a search of the marital home. *Matlock*, 415 U.S. at 171. A parent may consent to the search of a child's room and personal belongings in the family home (whether the child is an adult or a minor). *See, e.g.*, *United States v. DiPrima*, 472 F.2d 550, 551 (1st Cir. 1973); *Commonwealth v. Farnsworth*, 76 Mass. App. Ct. 87, 97 (2010) (same, and noting that the "'overwhelming majority' of courts are of the view that a parent may consent to the search of a child's room") (citing LaFave, 4 Search and Seizure § 8.4(b), at 268 (2020)); *United States v. Wright*, 564 F.2d 785, 790 (8th Cir. 1977); *United States v. Mix*, 446 F.2d 615, 619 (5th Cir. 1971); *Colbert v. Commonwealth*, 43 S.W.3d 777, 781 (Ky. 2001) (a parent's rights in a residence are superior to those of cohabitating children whether they are dependents or emancipated adults); *State v. Kinderman*, 136 N.W.2d 577, 580 (Minn. 1965) (same).[11]

[11] The exception to the common-law rule that a person with authority over a premises could give consent for a search over the objection of a person with equal authority, which is set out in *Georgia v. Randolph*, 547 U.S. 103 (2006), that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by *a physically present* resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident," *id.* at 120 (emphasis added), has no bearing as Michael had been removed from the premises before the consent to search was given by his parents. Tr.1 at 131, 151; *see also* LaFave, 4 Search and Seizure § 8.3(d), at 209 (2020). *Randolph* also imposes no duty on police "to take

7. Police may rely on the consent of a third party whom they reasonably, but mistakenly, believe has proprietary authority or joint control over a premises or personal property. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990); *see also* LaFave, 4 Search and Seizure § 8.3(g) (2020); *People v. Adams*, 422 N.E.2d 537, 540-541 (N.Y. 1981) (officer reasonably relied on the consent of a woman who claimed to be the defendant's roommate and who had a key to his apartment); *United States v. Hamilton*, 792 F.2d 837, 841-842 (9th Cir. 1986) (mother reasonably appeared to have custody and control of a son's motor home parked in her driveway); *United States v. Rith*, 164 F.3d 1323, 1330-1331 (10th Cir. 1999) (a parent is presumed to have control over an adult child's room in the family home); *United States v. Romero*, 749 F.3d 900, 906 (10th Cir. 2014) (same, stepparent). The reasonableness of police reliance on the apparent authority of a third party to consent to a search is determined by the facts available to the police at the time the search begins – later discovered facts that might cast doubt on the

---

affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Randolph*, 547 U.S. at 122; *see also Fernandez v. California*, 571 U.S. 292, 301 (2014) (the *Randolph* Court went "to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present").

initial (reasonable) determination to proceed are immaterial. *United States v. Morgan*, 435 F.3d 660, 664 (6th Cir. 2006).

8. The scope of a suspect's consent is measured under the Fourth Amendment by a standard of "objective" reasonableness —

> [W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect? . . . [A] suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization.

*Florida v. Jimeno*, 500 U.S. 248, 250-252 (1991). The professed object of the search ordinarily defines the scope of a defendant's consent. *Id.* at 251; *cf. United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) (a defendant's lack of knowledge of what the searching officer is searching for does not change the effect of a general consent); *United States v. Ibarra*, 948 F.2d 903, 906-907 (5th Cir. 1991) (general consent to search a house for evidence of drug trafficking reasonably extended to a search of the attic); *United States v. Ware*, 890 F.2d 1008, 1011 (8th Cir. 1989) (defendant's consent to a "complete search" of his apartment included access to a locked storage bin 10 feet from the entryway); *United States v. Milian-Rodriguez*, 759 F.2d 1558, 1563-1564 (11th Cir. 1985) (same, locked closet); *United States v. Pena*,

143 F.3d 1363, 1367-1368 (10th Cir. 1998) (spaces above bathroom and ceiling tiles of defendant's motel room).[12]

**ULTIMATE CONCLUSIONS OF FACT AND LAW**

1. The government has met its burden of showing by a preponderance of the evidence that the Vieras' consent for police to search their home for the gun they believed their son to have hidden on the premises was voluntary and prompted solely by their desire to ensure the safety of their grandson who they feared might stumble upon the weapon. The credible evidence established that the search was initiated by Suzie Viera without any prompting by the police and that the Vieras cooperated with the search by directing officers to the area of the house where they believed Michael had hidden the gun. It also cannot be disputed that the Vieras placed no limits or restrictions on the permission they gave police to conduct the search.

2. The Vieras, as the owners of the Lakefield Road home, had full authority over and access to the entire household, including the main house

[12] At the April 3, 2024 hearing, Giampapa's counsel stated that the defense was not raising any argument based on the scope of the search "at this time." Tr.2 at 65-66. While the court deems this a waiver, it notes that, under the overwhelming weight of authority, the announced object of the police search – a gun – justified the opening of any container (including a cereal box) in which a gun might have been hidden.

and basement where their daughter and her children and their son Michael and their grandson were living as temporary guests. Michael had taken few (if any) steps to create a reasonable expectation of privacy in the unfinished basement and family laundry room frequented by his sister, her children, his grandson, and his mother, Suzie.

3. There is no evidence to support Andrew Viera's testimony that Michael had established a tenancy in the basement living area by sporadically "throwing in" money towards utility payments. To the extent that Michael may have had an expectation of privacy as an "overnight guest" in his parents' home, this expectation was insufficient to override the superior interest of his parents in controlling access to their home.

4. The assertion by Michael and his stepfather that the Vieras had ceded exclusive control over and access to the main house to Michael is incredible on its face given the ample evidence that family members had free access to the entire premises, that the Vieras had possession of the keys to the house, and that the Vieras were in the midst of a major remodeling of the home which would have required continuing oversight on their part of the work being done.

5. Even had Michael established a sufficient expectation of privacy in the basement area of the house, the officers reasonably relied on the

apparent authority of his parents to give permission for the search. There is no believable evidence that the Vieras had subdivided their home into a muti-unit building (Unit 1 and Unit 2) or that the home was anything other than as Andrew Viera initially described it to police – a single-family residence with an accessory apartment.

6. To the extent that the issue is not waived, police were entitled to search any area or container, including the half-empty cereal box stored in the basement in which the professed object of the search, the gun, was hidden.

**ORDER**

For the foregoing reasons, the motion to suppress is DENIED. The Clerk will set the case for trial.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE