UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 22-CR-10270-RGS |
| | ) | |
| MICHAEL GIAMPAPA, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

Thirty-three-year-old Michael Giampapa ("GIAMPAPA" or "defendant") now stands convicted of another firearms charge. He has a significant, serious, and lengthy adult criminal record that spans more than sixteen years. On March 16, 2022, he was knowingly in possession of a loaded Smith & Wesson .380 caliber handgun with one round of ammunition in the chamber. The gun was found inside and at the bottom of a Kik cereal box that was located on an open shelving area in the basement of the residence where GIAMPAPA slept and where other belongings of his were located. The firearm was not secured in any way and easily accessible to anyone in the home. *See* Presentence Report ("PSR") ¶¶ 11, 20.

The facts of this case call for a significant sentence. The government recommends a term of 51 months followed by a term of 3 years of supervised release aimed at preventing GIAMPAPA from returning to firearm-related crimes. This represents the high-end of the advisory guidelines sentencing range ("GSR") established by the PSR. *Id.* at ¶ 129. Such a sentence is warranted and would communicate an unmistakably clear message both to GIAMPAPA and to other similarly situated individuals that society has laws which must be followed and that the penalties are severe for defendants convicted of firearm offenses. The

1

proposed sentence is fair, reasonable and comports with the 18 U.S.C. § 3553(a) factors.

## I.   DISCUSSION

### A.  Legal Framework

The advisory United States Sentencing Guidelines ("Guidelines" or "USSG") are "the starting point and the initial benchmark" in sentencing. *Gall v. United States,* 552 U.S. 38, 49-50 (2007). The Guidelines must be properly calculated and considered, but ultimately the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a). *Id*. at 49-50. Because each case is unique, the Court must make a particularized analysis of the nature and circumstances of the offense and the defendant's history and characteristics. *See* 18 U.S.C. § 3553(a)(1). The Court must then impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment, and the sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training, or treatment. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(D). The Court must also strive to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing." *See* *Gall*, 552 U.S. at 50.

### B.  Procedural History/U.S.S.G. Calculations

On October 6, 2022, a one-count indictment was returned charging GIAMPAPA with being a Felon in Possession of Ammunition, in violation of 18 U.S.C § 922(g)(1). ECF No. 2.[1]

---

[1] The indictment also contains a forfeiture allegation (18 U.S.C. § 924(d)/28 U.S.C. § 2461(c)).

ECF No. 1. On September 12, 2024, the defendant pled guilty to that one-count indictment. *See* PSR ¶ 2. In this case, he faces a statutory maximum sentence of 10 years of imprisonment and a maximum term of 3 years of supervised release for this conviction. *See* PSR cover page and ¶¶ 128, 131. On January 2, 2025, U.S. Probation issued the final PSR. Per U.S.S.G. § 2K2.1(a)(4), the defendant's base offense level ("BOL") is 20 as he committed the instant offense subsequent to sustaining one felony conviction of a crime of violence or a controlled substance offense (*see* PSR ¶¶ 45, 47). *See* PSR ¶ 29. Pursuant to U.S.S.G. § 2K2.1(b)(4), there is a 2-level increase to the BOL as the firearm was stolen. *See* PSR ¶ 30. There is an additional 2-level increase for obstruction of justice under USSG § 3C1.2, which the government discusses further below. These guideline calculations result in an adjusted offense level ("AOL") of 24. *Id.* ¶ 34. With a 3-level reduction for acceptance of responsibility, GIAMPAPA's total offense level ("TOL") is 21. *See* U.S.S.G. §§ 3E1.1(a),(b) and PSR ¶¶ 36-37. GIAMPAPA's criminal convictions establish a criminal history score of 3, resulting in a criminal history category ("CHC") of II. *See* PSR ¶¶ 49-50. With a TOL of 21 and a CHC II, the corresponding advisory GSR is 41-51 months. *See* PSR ¶ 129. The government agrees with the calculations as outlined in the PSR.[2]

### i.    A two-level enhancement under USSG § 3C1.2 is warranted

#### a.  Standard of Review

"The government bears the burden of proving a sentencing enhancement by a preponderance of the evidence." *United States v. Newton,* 972 F.3d 18, 20 (1st Cir. 2020). "It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence, and a district court may base its determinations on 'any evidence

---

[2] Given USPO's response in the final PSR, the government withdraws its objection.

that it reasonably finds to be reliable.'" *United States v. Lacouture*, 835 F.3d 187, 189–90 (1st

Cir. 2016) (quoting *United States v. Almeida*, 748 F.3d 41, 53 (1st Cir. 2014)).

### b.  USSG §§ 3C1.2 and 2A1.4

The enhancement found in USSG § 3C1.2, calls for a two-level increase to the offense

level in this case. Section 3C1.2 of the USSG provides as follows:

> "If the defendant recklessly created a substantial risk of death or serious bodily injury to
> another person in the course of fleeing from a law enforcement officer, increase by 2
> levels."

*Id.*   "Recklessness requires that the defendant was aware of the risk created by his conduct and

the risk was of such a nature and degree that to disregard that risk constituted a gross deviation

from the standard of care that a reasonable person would exercise in such a situation." *See*

*United States v. Carrero-Hernandez*, 643 F.3d 344 348 (1st Cir. 2011), citing USSG § 2A1.4

cmt. n.1; and § 3C1.2, cmt. n.2. The phrase "during flight" is to be construed broadly and

includes preparation for flight…" *Id.* at cmt. n.3. Under this section, the defendant is accountable

for his own conduct and, among other things, for conduct that he willfully caused. *See* USSG §

3C1.2. n.5. The application notes go on to state that "if death or bodily injury results or the

conduct posed a substantial risk of death or bodily injury to more than one person, an upward

departure may be warranted." *See* Chapter Five, Part K (Departures). *Id.* at n. 6. Also, *see United*

*States v. Vega-Rivera*, 866 F.3d 14 (1st Cir. 2017)(felon in possession firearm/illegal possession

of machine gun case involving high speed chase where court found defendant's conduct was

sufficiently egregious to support the application of the § 3C1.2 enhancement); *United States v.*

*Carrero-Hernandez,* 643 F.3d 344 348 (1st Cir. 2011)("as we have previously noted, the

Sentencing Commission promulgated § 3C1.2 in order to adopt the view that 'mere flight from

4

arrest was not sufficient for an adjustment, but that flight plus endangerment was enough'"); and *United States v. Alex Manuel Lopez-Felicie*, No. 21-1932 (1st Cir. July 22, 2024). In *Lopez-Felicie*, the court determined that an application note to the reckless endangerment guideline provides that if the conduct posed a substantial risk of death or bodily injury to more than one person, an upward departure may be warranted, and the panel therefore agreed with the district court that "[b]ecause the shootout on a residential street risked the lives of many people, an upward departure over and above the enhancement was clearly permissible, even encouraged, under the (advisory) Guidelines." Also, *see* USSG § 3C1.2 cmt. n.6. In affirming an above-guidelines sentence of 60 months where the advisory GSR was 12-18 months, the court noted "the reckless endangerment enhancement can apply if just one officer's life is endangered." *Id.* at 14. But see *United States v. Bell*, 953 F.2d 6, 10 (1st Cir. 1992)(as the court was constrained to find that under the USSG in force on the date of defendant's sentencing, the conduct relied upon by the court was insufficient for a 2-point upward adjustment for obstruction of justice).

Here, GIAMPAPA's actions posed a substantial risk of death or bodily injury to numerous law enforcement officials, including the numerous law enforcement officials who responded to the scene, and there is a sufficient basis to apply this two-level enhancement. As the court determined in *Vega-Rivera*, the defendant's conduct "is sufficiently egregious to support the application of the § 3C1.2 enhancement." *Vega-Rivera*, 866 F.3d at 20. By his own actions and criminal behavior, GIAMPAPA recklessly created a substantial risk of death or serious bodily injury to others in the course of his attempt to flee from law enforcement. There is no requirement that another individual actually be injured or harmed by the defendant's actions. Rather, the key term is that the defendant recklessly *created* a substantial risk of death or serious

5

bodily injury to another person in the course of him fleeing from police. He has done so in this case and is responsible for his own conduct which he willfully caused.

Police learned that GIAMPAPA may have a firearm inside the house. He refused to exit his residence when repeatedly directed by law enforcement, which resulted in a stand-off in a situation where the local police required the assistance of the MSP, the Cape Cod SWAT team, and a crisis negotiator. The perimeter of the residence was secured by law enforcement. When GIAMPAPA first came out of the residence, he had a knife in his hands and refused to drop the knife despite repeated commands to do so by officers. Instead, he paced back and forth and screamed at officers before retreating inside the residence. Several minutes later, officers again heard shouting coming from the residence and police then observed GIAMPAPA running from the front door of the home towards the driveway where he proceeded to get into the driver's side of a sedan vehicle. As he did so, the SWAT Team positioned a Bear Cat behind the sedan to prevent him from escaping and the sedan suddenly backed up and struck the Bear Cat before jerking forward and striking the garage door of the residence. GIAMPAPA then placed the car in reverse and again struck the Bear Cat before pinning it in place against the residence. Subsequently, he jumped out of the car and headed back towards the front door of the home having to climb over the hood of the vehicle. As he emerged from the car, police ordered him to stop and drop the knife. He was informed that if he did not surrender, bean bags would be deployed. Again, he failed to comply.   Instead, ran back towards the house and as he did, the SWAT Team deployed less lethal projective bean bags which struck GIAMAPAPA. He was able to slide across the front of the sedan and re-enter the front door of the residence and shut the door behind him. A short time later, the Bear Cat, which was equipped with a ram, opened the front

6

door of the residence. A few minutes later, GIAMPAPA again emerged from the rear of the house where he surrendered to police without further incident. Clearly, the defendant's actions demonstrated that he was trying to escape and evade police.

The government agrees with U.S. Probation Office's ("USPO") response to defendant's objection to the two-level enhancement under USSG § 3C1.2. USPO responded as follows:

During the defendant's standoff with law enforcement and during his several attempts to flee his home, he recklessly created a substantial risk of death or serious bodily injury to himself, his girlfriend ,and to the numerous law enforcement officials present. While officers were aware of the possible firearm in the home, police reports indicate the defendant also brandished a knife to officers. The defendant possessing at least two weapons inherently increased the danger in this situation.   Further, the defendant attempted to flee his home with the knife on his person at least twice by driving away from the scene. As he attempted to drive away, the defendant rear-ended a Bear Cat occupied by a SWAT officer twice.   He did so intentionally and recklessly, and without regard for the safety of officers standing nearby, as well as the officer occupying the Bear Cat. While medical records support the defendant's significant mental health needs, there is no indication of a "mental health break" occurring on this day. There is also no evidence that defendant was unaware of the risk created by his conduct, as such, the 2-point enhancement following the application of USSG 3C1.2 is applicable…" *See* PSR p.38.

GIAMPAPA is responsible for his actions. His actions were sufficiently reckless and created a substantial risk to others. The government has satisfied the burden of proof and the two-level enhancement under USSG § 3C1.2 applies.

## II. <u>APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS</u>

Section 3553(a) of Title 18 requires a sentencing court to consider specific enumerated factors when determining an appropriate sentence. These factors include but are not limited to the following: (1) the nature and circumstances of the offenses and the history and characteristics of the defendant, and, (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offenses, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the

defendant, and to provide for the needs of the defendant. *See* 18 U.S.C. §§ 3553(a)(1) and (2). The government asserts that an analysis of the factors enumerated in 18 U.S.C. § 3553(a) supports a sentence of 51 months which satisfies the interests of justice.

### A. Nature and Circumstances of the Offense

The government urges the Court to consider the nature and circumstances of the offense, to recognize the seriousness of GIAMPAPA's crime and to assess the crime for what it is. *See* 18 U.S.C. § 3553(a)(1). The offense of conviction involves the knowing illegal possession of a loaded .380 Smith & Wesson handgun by GIAMPAPA who was previously convicted of at least one felony crime punishable by imprisonment for a term exceeding one year.

On the date of offense, police were dispatched to a residence for a domestic disturbance. The domestic incident involved GIAMPAPA and his mother ("SV"). Prior to the date of offense, GIAMPAPA had recently been released from jail and was staying in the basement of the residence where the gun was recovered. GIAMPAPA's actions ultimately led to a standoff with law enforcement at his parents residence which involved local police, MSP, the Cape Cod Regional SWAT team, as well as a crisis negotiator. During the standoff with law enforcement, GIAMPAPA repeatedly refused to comply with the commands of the police. He also came out of the residence with a knife in his hands and refused to drop the knife despite repeated commands to do so by officers. Instead, he paced back and forth and screamed at officers before retreating inside the residence. *Id.* ¶ 18. When he came back out from the house next, he again refused to comply with law enforcement commands and instead, got into a vehicle and proceeded to back the car into the law enforcement Bear Cat vehicle in an attempt to evade police; he then drove into garage door of the home before jumping out of the car and running back into the residence.

Only later, did GIAMPAPA surrender to police without incident. After his arrest, police searched the basement of that residence and located a loaded .380 caliber handgun in the bottom of a cereal box that was located on a shelf that was out in the open and easily accessible to anyone in that residence. *See* PSR ¶¶ 9-24.

Shortly after 2:34pm on March 16, 2022, Yarmouth Police responded to a call reporting a domestic disturbance at a residence in South Yarmouth. The disturbance involved GIAMPAPA and SV, who is the legal guardian of GIAMPAPA's then 3-year-old son who lived with she and her husband ("AV") at that residence. SV and AV are the co-owners of the home. When officers arrived, SV was outside of the residence speaking by phone with GIAMPAPA. *See* PSR ¶ 11, 13. After police arrived, SV told police that GIAMPAPA is "down in the basement and he's not going to come out for you guys." *Id.* at ¶ 12. SV told police that GIAMPAPA told her that he has a gun. GIAMPAPA barricaded himself and his girlfriend in the basement and was speaking to his mother by phone. YPD called dispatch and updated them that they were dealing with a barricaded person who may be in possession of a firearm. Backup law enforcement was requested. *Id.*

By phone, SV asked him to come out of the residence but he continued to refuse. At some point, GIAMPAPA's stepfather ("AV") arrived at the residence and got out of a vehicle. While outside of the residence, SV told AV "Michael's in the basement and he says he has a gun." *Id.* at ¶ 13. While on the phone with GIAMAPAPA, SV asked him to be reasonable and to come out and speak with the police but GIAMPAPA continued to refuse. A moment later the call ended and SV told police that "Michael said if the police come in to get me, I'm going to shoot it out, that [he's] not going back to prison." *Id.* SV connected by phone again with GIAMPAPA and an

officer got on the phone and asked GIAMPAPA to exit the residence so police could investigate the reason for the call, but GIAMPAPA refused, began to swear at the officer and said he wouldn't speak with the officer. SV got back on the phone with GIAMPAPA and the officer overheard SV tell GIAMPAPA that if the police come for him he will be dead. *Id.*

While outside the residence, SV related to the police that GIAMPAPA's behavior was out of control and erratic earlier that day because his ex-girlfriend had sent a video of GIAMPAPA "on the nod" due to heroin use — along with other evidence of heroin use with his minor son present — to the Department of Children and Families ("DCF"). *Id* at 14. Earlier that day, SV received a call from DCF concerning the video and was informed that DCF is investigating which could lead to removal of the minor child from the residence. *Id.* That afternoon, SV went down to the basement and confronted GIAMPAPA about this and he became extremely angry at his mother and began screaming, yelling, and swearing. SV left the basement and went upstairs and GIAMPAPA followed her. Due to his erratic and out of control behavior, SV left the house and locked herself in a car, and GIAMPAPA followed her outside and yelled at her and started to hit the car while she was inside of it. *Id.* SV told GIAMPAPA that she was going to call the police at which time he left and returned inside of the residence where he was located when police arrived on scene. *Id.* Once GIAMAPAPA went back inside of the house, SV got out of the car and eventually called GIAMPAPA by phone. While she was on the phone with him, police arrived outside the residence. *Id.*

While outside the residence, SV explained to YPD that she was fearful of what GIAMPAPA might do to her given his mental state. *Id.* at ¶ 15. SV and AV told police they believed GIAMPAPA has a gun in the residence because earlier that day, he had said he had a gun. *Id.*

Among other statements, SV and AV expressed that their main concern is for the safety of their minor grandson who resides with them. While outside the residence, SV and AV also asked an officer to contact YPD Detective Kent whom they both knew and wanted to speak with. *Id.* Therefore, an officer at the scene called Detective Kent, who was at the YPD, and informed him that he was with SV and AV and that they were extremely concerned that during the incident at the residence, GIAMPAPA made a statement referencing having a gun in the house. *Id.* The officer relayed to the detective that SV and AV have not seen a gun in the house. However, because SV has custody of GIAMPAPA's minor child, they were concerned about the safety of their grandchild who could come into contact with the gun. SV and AV asked police to check the house for a gun and remove it if found. *Id.* SV and AV then spoke separately with the Detective Kent by phone. *Id.* at ¶ 16. SV told Detective Kent GIAMPAPA's minor son has free access to the entirety of the home and SV was concerned the child may find a firearm in the residence if one was present. *Id.* After the call ended, Detective Kent left the YPD and drove to the residence. *Id.*

While on scene outside of the residence, other YPD officers spoke with GIAMPAPA by phone several times in an attempt to have him exit the home peacefully but he refused. *Id.* at ¶ 17. A trained crisis negotiator arrived on scene and began speaking with GIAMPAPA by phone. Other YPD officers, MSP troopers and members of the Cape Cod Regional SWAT Team arrived to provide additional support and to establish a perimeter around the residence. *Id.* After considerable discussion with the crisis negotiator, GIAMPAPA opened the front door of the residence. While maintaining a position of cover a safe distance away, the crisis negotiator engaged GIAMPAPA in a dialogue, seeking to secure a peaceful surrender. *Id.* at ¶ 18.

11

GIAMPAPA was highly agitated. In the threshold of the open doorway, he paced back and forth, screamed obscenities at police and refused to step outside. The crisis negotiator eventually persuaded GIAMPAPA to have his girlfriend come out of the residence. Once his girlfriend left the residence, GIAMPAPA closed the door and returned inside the home. *Id.* At some point thereafter, GIAMPAPA exited the home from a slider door with a knife in his hand. Officers repeatedly issued commands to him to drop the knife but he refused. Instead, GIAMPAPA paced back and forth and screamed at the officers before turning and retreating inside. *Id.*

Several minutes later, officers again heard shouting coming from the residence. *Id.* at ¶ 19. Officers then observed GIAMPAPA running from the front door of the residence towards the driveway and he proceeded to enter the driver's side of a sedan. As he did so, members of the Cape Cod SWAT Team positioned a Bear Cat behind the sedan to prevent GIAMPAPA from escaping. *Id.* The sedan suddenly backed up and struck the Bear Cat before jerking forward and striking the garage door. GIAMPAPA then placed the vehicle in reverse, once again striking the Bear Cat before ultimately crashing into the home. *Id.* At that point, the Bear Cat struck the sedan, pinning it in place against the residence. GIAMPAPA subsequently jumped out of the vehicle and headed back towards the front door of the residence by climbing over the hood of the vehicle. *Id.* As GIAMPAPA emerged from the vehicle, law enforcement ordered him to stop and drop the knife. He was notified that bean bags would be deployed if he did not surrender. *Id.* As he ran back towards the house, members of the SWAT Team deployed less lethal projectile bean bags which struck GIAMPAPA. GIAMPAPA was able to slide across the front of the vehicle and re-entered the residence and shut the front door behind him. *Id.* A short time later, the Bear Cat, which was equipped with a ram, opened the front door of the residence. After a few

12

minutes, GIAMPAPA again emerged from the rear of the house where he surrendered peacefully without further incident and was arrested. *Id.*

After GIAMPAPA was taken into custody and the scene secured, police lawfully searched the home. *Id.* at ¶ 20. In the basement area where GIAMPAPA had been staying since his recent release from jail, police recovered a loaded Smith & Wesson M&P Bodyguard .380 caliber handgun, containing one round of .380 ammunition in the chamber. *See* PSR at ¶¶ 19, 20. The stolen firearm was found inside and at the bottom of a Kix cereal box that was out in the open. *Id.* at ¶¶ 20, 21. The cereal box was located on top of open shelving in the area of the basement where GIAMAPAP slept and was found in the same area of the basement where GIAMPAPA's belongings, including clothing, sneakers, his wallet with his Massachusetts driver's license, and paperwork with GIAMPAPA's name, were located. No magazine was recovered. *Id.* at ¶ 20.

## B. The Defendant's Criminal History and Characteristics

The Court may properly consider GIAMAPAPA's criminal history and characteristics which are important considerations under the factors outlined in 18 U.S.C. § 3553(a)(1). He is currently 33 years old and has an adult criminal history dating back more than sixteen years, to 2008. *See* PSR ¶¶ 40-58. A review of his criminal record illustrates his numerous, serious felony convictions, with his longest period of incarceration being a 5–7-year state prison sentence imposed in 2013. *See* PSR ¶ 48. Yet, notwithstanding a lengthy prison term, he remained undeterred when he committed the instant, serious crime.

In December 2008, at the age of 17, GIAMPAPA received a six-month continuance without a finding ("CWOF") for a charge of Assault and Battery with a Dangerous Weapon (shod foot). PSR ¶ 45. In March 2009, he was found in violation of probation and received

13

community service in lieu of fines. In January 2010, he was again found in violation of probation and received a 6-month committed sentence. *Id.* Per the PSR, "court dockets confirm the defendant incurred several probation violations during his period of supervision." *Id.* Five months later in May 2010, he was charged with Trespass and the following month of June 2020, received a four-month CWOF, which was later dismissed on November 23, 2010. *Id.* ¶ 46.

In September 2011, GIAMPAPA was arrested and charged with serious offenses including Assault to Murder (count 1), Carrying a Firearm without a License (count 2), Possession of a Firearm without a FID card (count 3), Possession with Intent to Distribute Class A (heroin) (count 4), and Firearm Violation with two Prior Violent/Drug Crimes (count 5).[3] On July 3, 2013, he was convicted of counts 2 through 5 and received the following sentences: 3 years to 3 years and 1 day committed sentence (count 5), a 2 ½ years to 2 ½ years and 1 day committed sentence (count 2), and a 2 year probationary period (counts 3 and 4). *Id.* ¶ 47. However, on March 5, 2020, he was found in violation of probation and received a 2 ½ years to 2 ½ years and 1 day committed sentence. *Id.* The uncontested facts in the PSR reveal that on August 29, 2011, police responded to a motel in West Yarmouth for reports of gun shots and upon arrival, located two brothers in the hotel parking lot who were suffering from gunshots. According to the brothers (victims), the defendant came out of a room in the hotel to speak with the brothers in the parking lot and as the group discussed money owed, a physical altercation ensued, resulting in the defendant shooting the victims. Officers were informed the defendant fled the area on foot following the shooting. *Id.* As officers completed a protective sweep of the defendant's hotel room, they discovered two digital scales, white powdery residue, several zip-

---

[3] On July 3, 2013, a nolle prosequi was filed on count 1.

lock postage size baggies. A search warrant was executed on that hotel room and officers also recovered a sandwich baggie containing a brownish powdery substance, $3,009 in cash held together by a rubber band, and several items of the defendant's, including his wallet containing his learner's permit. *Id.*

Following the hotel incident, detectives responded to a hospital to speak with the victims and one of the victims, victim #1, related to police that his brother (victim #2) enlisted his help in recovering a debt owed to him from an individual named "Kyle." Victim #1 didn't know Kyle and told detectives he suspected it was associated with drugs. As the two victim brothers arrived at the hotel, the defendant exited a hotel room, stood on the balcony for a short time, returned to the room and closed the door before re-emerging within a few seconds. Defendant then began walking down the steps towards the parking lot and used a profanity. When he got to the parking lot, the defendant and victim #2 got into a physical altercation and shortly after victim #1 recalled hearing three gunshots, and hearing his brother say, "fuck he shot me…[victim 1's name] I got shot." The defendant then turned towards victim #1 and pointed the gun directly at his chest. Victim #1 reached out towards the defendant and pushed the gun away before hearing another shot and feeling a pain in his stomach. Detectives confirmed that victim #1 was being treated for a gunshot injury to his abdomen. Victim #1 positively identified the defendant as the shooter from a photo array. *Id.*

While detained pretrial in the instant case, GIAMPAPA has been held at three different correctional facilities. *See* PSR ¶ 4. As evidenced by his disciplinary offenses committed while he has been held pretrial, GIAMPAPA has demonstrated a lack of compliance with rules and regulations. *Id.* ¶ 5. Specifically, while held at the Wyatt Detention Facility, he was found guilty

15

of several disciplinary offenses. On November 28, 2022, he refused a housing unit assignment and received 4 days' disciplinary segregation. *Id.* On May 14, 2023, he repeatedly referred to a corrections officer using profanities and was found guilty of insolence towards staff and being sentenced to 7 days' disciplinary segregation. *Id.* Two days later on May 16, 2023, officers conducting a search of his cell recovered two pills and a sheet of folded paper which had an appearance consistent with K2 and he was found guilty of possession of drug paraphernalia and hoarding medication. *Id.* Less than four months later on September 5, 2023, he was found guilty of group demonstration/activation of Correctional Emergency Response Team, conduct which disrupts, and refusing lawful orders, for which he was sentenced to 60 days' disciplinary segregation. *Id.* A letter from the Chief of Programs at Wyatt confirmed that GIAMAPAPA participated in a painting/clearing detail of the facility and the chief described his participation as "an integral part of the success of the detail." *Id.*

Additionally, GIAMPAPA's upbringing, family life, mental and emotional health, educational background, substance abuse, and employment are outlined in the PSR. *See* PSR ¶¶ 60-123. According to GIAMPAPA, in 2016, while incarcerated, he passed his high school equivalency test. *Id.* ¶ 115. As outlined in the PSR, he has a sparce employment history. In his presentence interview with U.S. Probation, GIAMPAPA indicated he had no work experience as a young adult and sold drugs to support himself. *Id.* at ¶ 117. At the time of his arrest, he was employed doing tree work for a company in Cape Cod. *Id.* ¶ 119. In 2018-2019, he was a seasonal landscaper for a business in Yarmouth that was owned by his stepfather. *Id.* ¶ 120. Per GIAMPAPA, while serving his 3 years to 3 years and 1 day committed sentence (imposed in 2013), he was befriended by an older inmate who worked building homes and upon being

16

released from custody, that inmate hired him and trained him on how to build homes. *Id.* ¶¶ 47, 121. While incarcerated at Wyatt, he was employed as a pod runner. In March 2023, he received a 'poor' performance review with a notation that he was insolent towards a staff member on March 21, 2023. In April 2023, he received a 'good' performance review. In May 2023, he was terminated from his position dur to receiving a disciplinary report for insolence towards staff on May 14, 2023. *Id.* ¶¶ 5, 118. As a condition of his supervised release, GIAMPAPA should be required to seek and maintain employment.

The PSR details GIAMPAPA's significant substance abuse issues and history. He first consumed alcohol at age 12; began stealing some of his mother's prescribed Percocet pills when he was 13; used Vicodin and oxycodone a few times as a teen; used marijuana daily between the ages of 14-17 years old; tried cocaine approximately four times, most recently in 2022; tried heroin at the age of 17 and used daily until he was incarcerated at the age of 20 in 2011 (and has not used heroin since); first tried fentanyl around 2018 when he was 27 and soon became addicted and was using 2-4 grams per day until his related state arrest in this case. *Id.* ¶¶ 100-105. GIAMPAPA "acknowledges the devastating affects his substance use has caused in his life. It has strained his familial relationship, affected his mental health treatment, and directly caused chronic law enforcement contact. He has also noticed that Percocet have been particularly detrimental and problematic for him." *Id.* ¶ 106. GIAMPAPA related he has experienced several bouts of sobriety over the years, often getting clean while in custody, and relapsing once released into the community. He engaged in treatment around 2018 at a rehabilitation center in Hyannis and also received methadone treatment from August 2022 until his instant arrest. *Id.* ¶ 107.

As stated earlier, throughout this case, GIAMAPAPA has been held pretrial at various

17

detention facilities including Wyatt in Rhode Island, Adroscoggin County Jail in Maine, and the Metropolitan Detention Center ("MDC") in New York. While at the county jail in Maine, his methadone prescription was discontinued as that jail does not offer methadone treatment. *Id.* ¶ 108. While detained pretrial at the MDC, he was administered certain medication as part of that jail's medication assisted treatment ("MAT") program. *Id.* ¶ 109. Records from that facility confirm that certain medications, including methadone were discontinued while he was detained at that facility. *Id.* Per the PSR, while he is being detained at Wyatt, GIAMPAPA is participating in their MAT program. *Id.* ¶ 110. Per U.S. Probation, it appears he is an appropriate candidate for the Bureau of Prison's 500-hour Residential Drug Abuse Program ("RDAP") based on his reported history of substance abuse prior to his arrest and he has expressed an interest in participating in the program. *See* PSR ¶ 111. As an additional condition of supervised release, the government recommends GIAMPAPA be required to continue to engage in substance abuse treatment throughout the pendency of his supervised release.

Following his arrest in the instant case, upon being transported to the police station, officers observed GIAMPAPA to be lethargic, nodding off, and unable to stand up without being held up. *See* PSR ¶ 88. Officers also noticed his speech was unintelligible. GIAMPAPA states he was transported to Cape Cod Hospital where he was treated for an overdose of pills and was hospitalized for two days. According to him, during the standoff with law enforcement, he took several of those pills in a suicide attempt. *Id.*

### C. The Need for Specific and General Deterrence, and Protection of Public from Further Crimes of Defendant

The Court must also consider deterring both GIAMPAPA and others as well as protecting the public from further crimes of this defendant. *See* 18 U.S.C. §§ 3553(a)(2)(B), (C) (the court

18

may impose a sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant"). The government contends its recommended sentence would comport with the goals of specific deterrence. Despite multiple arrests and convictions for serious offenses spanning more than sixteen years, despite serving a lengthy state prison sentence for a serious crime, despite being found in violation of his terms and conditions of probation on more than one occasion, and despite incurring multiple disciplinary reports while being held in custody, GIAMPAPA continued to commit serious crimes and continued to disregard rules and policies of incarcerative facilities. He has failed to learn that the criminal justice system will punish those who repeatedly ignore the law and commit new crime(s). He has not gotten the message of complying with society's laws despite his multiple, prior incarcerative sentences, so this sentence needs to make that point clear. GIAMPAPA needs to be held accountable. The government seeks the Court to sentence him in a manner that both communicates to him the seriousness of his criminal behavior and makes it clear that continued criminal conduct will not be permitted.

An equally important consideration here is general deterrence. *See* 18 U.S.C. § 3553 (a)(2)(B) (sentencing goals include the need to afford adequate deterrence to criminal conduct). Illegally possessing firearms has a negative impact on the community at large. A sentence of 51 months would communicate to GIAMPAPA and to others that there are significant consequences for committing this crime. Messages that consider the seriousness of illegally possessing a firearm as well as the need to protect public safety by imposing significant sentences can help make communities safer and deter others from committing the same crimes. The government seeks that a message be sent to others, like GIAMPAPA, who have been in and out of the

19

criminal justice system and continue to commit serious crimes. The message should be clear: illegally possessing firearms or ammunition will not be tolerated. Imposing a high-end advisory GSR of 51 months would send the appropriate message and would tell similarly situated individuals that if they too continue their criminal conduct and are convicted in federal court, they too will face staff prison sentences.

The PSR also outlines the Judiciary Sentencing Information ("JSIN") for the period from 2019-2023 with defendants who had the same guideline USSG guideline as GIAMPAPA (i.e., USSG § 2K2.1), with a final offense level of 21 and CHC II. For 369 defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 39 months and the median length of imprisonment was 41 months. *See* PSR ¶ 144. However, those figures do not indicate how many, if any, of those defendants, had prior firearm convictions and other serious convictions that were not scored due to their age. Additionally, in the PSR, U.S. Probation identified GIAMPAPA's criminal history inadequacy as a potential grounds for an upward departure. *See* PSR ¶ 142. "The Court may wish to consider the defendant's lengthy history of criminal convictions, several of which, are for violent conduct and do not score since they fall outside of the applicable scoring window. Therefore, the criminal history category may under presents the seriousness of the defendant's criminal history and likelihood to reoffend." *Id.* Although the government is not seeking an upward variance or departure in this case, it does believe that a high-end GSR sentence is appropriate.

### III.    CONCLUSION

For the foregoing reasons, the government recommends a 51-month term of

imprisonment, followed by 3 years of supervised release, forfeiture, and a $100 mandatory

special assessment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:         */s/ Suzanne Sullivan Jacobus*
Suzanne Sullivan Jacobus
Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Suzanne Sullivan Jacobus*
Suzanne Sullivan Jacobus
Assistant U.S. Attorney

Date: January 21, 2025